**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JESSE D. GIDDINGS,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:22-cv-00097** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **LT. ROGERS, et al.,** | : | |
| **Defendants** | : | |

<u>**MEMORANDUM**</u>

Currently before the Court is the sole remaining Defendant's motion for summary judgment on pro se Plaintiff's claim under 42 U.S.C. § 1983 for excessive force in violation of the Fourteenth Amendment to the United States Constitution.  For the reasons set forth below, the Court will grant the motion.

**I.     BACKGROUND**

**A.     Procedural Background**

Pro se Plaintiff Jesse D. Giddings ("Giddings"), who is proceeding in forma pauperis, commenced this action by filing a complaint, which the Clerk of Court docketed on January 18, 2022.  (Doc. No. 1.)  In the complaint, Giddings indicated that he was asserting claims under 42 U.S.C. § 1983 for violations of his Eighth and Fourteenth Amendment rights against four (4) Defendants working at the Lycoming County Prison ("LCP"): (1) Lt. Rogers ("Rogers"); (2) Nurse Sheila; (3) Nurse Kim; and (4) Dr. McGlauklyn.  (Id. at 1–3.)  For relief, Giddings requested monetary damages and to have Rogers fired from his job.  (Id. at 5.)

In support of these legal claims and requests for relief, Giddings alleged that while a pretrial detainee at LCP on November 8, 2021, he was involved in "an altercation . . . on G-Block while [he was] trying to go to [his] morning recreation."  See (id. at 2, 4).  After this "altercation," he was handcuffed (presumably by an LCP correctional officer, and perhaps by

Rogers) and placed in an elevator to be transported to intake.  See (id. at 4).  While handcuffed, Rogers elbowed Giddings in the back of his head and yelled into his ear, "I told you to face the fu**ing wall again."  See (id.).  The impact of Rogers's elbow to Giddings's head caused Giddings to experience severe neck and back pain.  (Id.)  Giddings alleges that he attempted to talk to Nurse Sheila, "who was comming [sic] to start her shift," about his neck and back pain, but she denied him medical attention, as did Nurse Kim and Dr. McGlauklyn.  See (id.).  Giddings averred that he never received proper medical treatment or even an examination for the "abuse [he] took from . . . Rogers."  See (id.).

After reviewing the complaint, the Court permitted it to pass statutory screening and directed the Clerk of Court to send waiver of service forms to Defendants.  (Doc. No. 10.)  Defendants waived service (Doc. Nos. 15–17, 19), and then separately filed motions to dismiss the complaint along with supporting briefs.[1]  (Doc. Nos. 20–23.)  Giddings never responded to the motions to dismiss.

On March 6, 2023, the Court issued a Memorandum and Order which resulted in the dismissal of Giddings's claims against Dr. McGlaughlin, Nurse Sheila, and Nurse Kim, and his Fourteenth Amendment excessive force claim against Rogers moving forward.  (Doc. Nos. 26, 27.)  Although the Court gave Giddings the opportunity to file an amended complaint as to his dismissed claims, Giddings never filed an amended complaint.  Then, on April 14, 2023, Rogers

---

[1]  Defendants Rogers, Nurse Sheila, and Nurse Kim (collectively, the "LCP Defendants") jointly filed a motion to dismiss (Doc. No. 21), and Dr. McGlauklyn filed a separate motion (Doc. No. 20).  In the LCP Defendants' motion, they noted that "Nurse Sheila" was Sheila Lain, "Nurse Kim" was Kim Poorman, and Rogers's first name was Josh.  (Doc. No. 21 at 1.)  In Dr. McGlauklyn's motion, he pointed out that the proper spelling of his full name was "Shawn P. McGlaughlin."  (Doc. No. 20 at 1.)  Hereinafter, the Court will use the proper spelling for Dr. McGlaughlin.

filed an answer with affirmative defenses to the complaint.  (Doc. No. 28.)  The case then proceeded to discovery.

After completing discovery, Rogers filed the instant motion for summary judgment, along with a statement of undisputed material facts and appendix, on December 18, 2023.  (Doc. Nos. 32–24.)  Rogers later filed a supporting exhibit—a DVD containing video recordings of events on November 8, 2021—on December 22, 2023, and then filed a brief in support of his motion on December 29, 2023.  (Doc. Nos. 35, 36.)  Giddings never filed a response in opposition to the motion for summary judgment.  Therefore, the motion is ripe for disposition.

### B.    Factual Background

As just stated, Rogers filed a statement of material facts in support of his motion for summary judgment in accordance with this Court's Local Rules.  (Doc. No. 33.)  However, Giddings did not file a counter statement of material facts, responding to the numbered paragraphs set forth in Rogers's statement, as required by the Local Rules.  Thus, Rogers's facts in his statement are deemed admitted because:

> A failure to file a counter-statement equates to an admission of all the facts set forth in the movant's statement.  This Local Rule serves several purposes.  First, it is designed to aid the Court in its determination of whether any genuine issue of material fact is in dispute.  Second, it affixes the burden imposed by Federal Rule of Civil Procedure 56(e), as recognized in Celotex Corp. v. Catrett, on the nonmoving party 'to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designated specific facts showing that there is a genuine issue for trial.' 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted) (emphasis added).

See Williams v. Gavins, No. 13-cv-00387, 2015 WL 65080, at *5 (M.D. Pa. Jan. 5, 2015) (emphasis in original) (citation omitted), aff'd sub nom., Williams v. Gavin, 640 F. App'x 152 (3d Cir. 2016) (unpublished).  Thus, the undisputed material facts are derived from Rogers's statement.  The Court recounts the relevant facts from this statement below.

### 1.   The Events of November 8, 2021

On November 8, 2021, at approximately 6:25 a.m., Correctional Officer Stephen George ("CO George") was assisting other LCP correctional staff with taking the inmates housed on the upper tier of G-Block to the gym.[2]  (Doc. No. 33 ¶ 7.)  After the inmates exited their cells, they waited in the G-Block dayroom area until correctional staff was ready to escort them to the gym. (Id. ¶ 8.)  Giddings, a pretrial detainee housed on the upper tier of G-Block in cell G-22, was one of the inmates waiting in the dayroom area.  (Id. ¶¶ 1, 9, 10–13.)  While Giddings was in the dayroom area, another inmate, Terrance Hopson ("Hopson"), approached him and punched him in the head or neck area while they were standing between the dayroom tables and the cell block door.  (Id. ¶¶ 14, 15.)  Giddings and Hopson then began fighting.  (Id. ¶ 16.)

At the time the fighting began, CO George and Correctional Officer Grimm ("CO Grimm"), were walking down the stairs from the upper tier.  (Id. ¶ 17.)  CO George called for "back-up" over the radio and then ordered the inmates to stop fighting.  See (id. ¶¶ 18, 19). Despite this verbal order, both inmates continued to fight.  (Id. ¶ 20.)  CO George then approached Giddings and, for a second time, ordered the inmates to stop fighting.  (Id. ¶ 21.) Again, the inmates continued to fight.  (Id. ¶ 22.)

CO Grimm and CO George attempted to separate the inmates and stop them from fighting, with CO Grimm attempting to restrain Hopson, and CO George attempting to restrain Giddings.  (Id. ¶¶ 23–25.)  At this time, Giddings had a hold of, and refused to release, Hopson's hair.  (Id. ¶¶ 27–28.)

---

[2] G-Block was a disciplinary cell block at LCP.  (Doc. No. 33 ¶ 4.)  It had two (2) tiers of cells, with each tier holding five (5) cells, and each cell housing up to two (2) inmates.  (Id. ¶ 5.) Inmates housed on G-Block were allowed out of their cells for gym one (1) tier at a time.  (Id. ¶ 6.)

Eventually, CO Grimm and CO George separated Giddings from Hopson.  (Id. ¶¶ 29–30.)
CO Grimm took Hopson to the floor between the dayroom tables and the entrance to G-Block.
(Id. ¶ 29.)  CO George took Giddings to the floor between the dayroom tables.  (Id. ¶ 30.)  While
there, Giddings continued to physically resist CO George's efforts to restrain him and attempted
to stand up.  (Id. ¶ 36.)  Thus, CO George had to take Giddings to the floor for a second time
between the dayroom tables and the cell block window.  (Id. ¶ 37.)

While CO Grimm and CO George were physically engaged with Hopson and Giddings to
stop them from fighting, a correctional officer in an LCP sub-control room called over the radio,
"officers need assistance."[3]  See (id. ¶ 31).  Rogers, along with Correctional Officers Hess ("CO
Hess") and Sweitzer ("CO Sweitzer"), responded to the call.  (Id. ¶¶ 40–41.)  When these
officers arrived at G-Block, they found CO Grimm and CO George attempting to physically
restrain Giddings and Hopson on the floor of the G-Block dayroom.  (Id. ¶ 41.)  Giddings was
still actively and physically resisting CO George.  (Id. ¶ 39.)

Rogers ordered the other inmates who were out of their cells in G-Block to go upstairs to
the upper tier.  (Id. ¶ 42.)  Each inmate complied with this directive.  (Id.)  Rogers then first
helped CO Grimm restrain Hopson by placing handcuffs on him.  (Id. ¶ 43.)  Once Hopson was
in handcuffs, CO Grimm and CO Sweitzer escorted him out of G-Block to Elevator 2.  (Id. ¶ 44.)

Now that Hopson was restrained and moved, Rogers helped CO George restrain Giddings
by placing handcuffs on Giddings.  (Id. ¶ 46.)  CO George and Rogers also helped Giddings to

---

[3]  In general, when a call for "back-up" is changed to "officer[(s)] need assistance," this means
that an inmate is combative, and officers are physically involved with one or more inmates.  See
(id. ¶ 32).  Officers responding to this call do not take time to don protective equipment; instead,
they respond immediately as is because (1) an "officer needs assistance" call is an emergency
and (2) this call confirms a serious threat to the safety and security of correctional staff and the
institution.  See (id. ¶¶ 33–35).

his feet.  (Id. ¶ 47.)  With Giddings on his feet, CO George and Rogers escorted him to Elevator

1.  (Id. ¶ 48.)  Upon entering Elevator 1, CO George and Rogers walked Giddings toward the

corner of the elevator.  (Id. ¶ 49.)  Rogers then verbally directed Giddings several times to face

the corner of the elevator.[4]  (Id. ¶ 50.)

In Elevator 1, CO George had his left hand on the right side of Giddings's back, and

Rogers had his right hand on the left side of Giddings's back and his left forearm on Giddings's

left shoulder.  (Id. ¶ 53.)  Giddings did not comply with Rogers's verbal commands to face the

corner.  (Id. ¶ 54.)  Instead, Giddings tensed up and pushed back away from the corner.  (Id. ¶

55.)  In response to Giddings's movement, CO George placed his right hand on Giddings's right

arm to redirect him into the corner.  (Id. ¶ 56.)  At the same time, Rogers began using his right

hand and left forearm to redirect Giddings into the corner.  (Id. ¶ 57.)  In addition, both CO

George and Rogers gave Giddings verbal directives to face the corner.  (Id. ¶ 58.)  Overall,

Giddings was ordered numerous times to face the corner of the elevator.  (Id. ¶ 59.)

Giddings, however, continued to actively resist and refuse to follow directives, and he

turned his head toward Rogers.[5]  (Id. ¶¶ 60, 61.)  At this point, Rogers quickly moved his left

forearm from Giddings left shoulder to the back of Giddings's head to redirect him into the

corner.  (Id. ¶ 62.)  Rogers used this force as an active countermeasure to gain Giddings's

compliance and mitigate the chance he might spit at or harm Rogers or CO George with a kick or

a headbutt.  (Id. ¶¶ 64, 75.)  This was the minimum amount of force Rogers felt was necessary to

---

[4]  This verbal directive is given to combative inmates so the escorting officers can more easily
control the inmate.  (Id. ¶ 51.)  Because the call had gone out for "officers need assistance,"
Rogers understood that Giddings had been combative and resisted officers' directives before
Rogers's arrival on G-Block.  See (id. ¶ 52).

[5]  Video from the elevator showed Giddings turning his head away from the corner and towards
Rogers for approximately two (2) seconds.

direct Giddings, gain his compliance with CO George and Rogers's verbal directives, and prevent him from assaulting correctional staff.  (Id. ¶ 77.)  Based on Rogers's training and experience, this minimal use of force in the elevator was justified because Giddings had been combative, had been noncompliant with both physical and verbal directives, had been security threat to both correctional officers and other inmates, and it allowed Rogers to assert the most control over him in the corner of the elevator.  (Id. ¶ 78.)

Despite Rogers moving his forearm to the back of Giddings' head, Giddings continued to actively resist.  (Id. ¶ 63.)  Rogers and CO George held Giddings in this position for approximately ten (10) seconds, until the elevator doors opened.  (Id. ¶¶ 65, 67.)  Once the doors opened, Rogers deescalated his use of force.  (Id. ¶ 66.)  At this time, Rogers and CO George transported Giddings from the elevator to a holding cell without incident.  (Id. ¶ 69.)  Shortly thereafter, CO George returned to the holding cell and asked Giddings if he was ok and whether he needed to see a nurse.  (Id. ¶ 70.)  CO George also told Giddings that he should have an opportunity to see the nurse before returning to his cell.  (Id. ¶ 72.)  Giddings told CO George that his neck hurt because of the punch he took from Hopson that started the fight between them on G-Block.  (Id. ¶ 71.)

Later that afternoon, CO George escorted Giddings to the Male Special Management Unit ("SMU") at LCP.  (Id. ¶ 73.)  Giddings made no further complaints about his neck at that time.  (Id. ¶ 74.)  Based on these events, Rogers wrote an Informational Report, and CO George wrote both an Informational Report and an Incident Report.  (Id. ¶¶ 79, 80.)

## 2.      Giddings's Deposition Testimony[6]

Giddings was deposed on September 5, 2023.  (Doc. No. 74 at 172.)  During his deposition, Giddings testified that when he came down to the dayroom on November 8, 2021, Hopson "tried to jump on [him]" by "sw[inging] on [him]."  See (id. at 175, 176).  Giddings acknowledged that Hopson hit him directly in the face, but he was not sure how many times he was hit.  See (id.).  Giddings believed he may have "landed" some hits on Hopson as well.  See (id. at 176).  Giddings estimated that the "altercation" lasted approximately ten (10) to twenty (20) minutes.  See (id. at 176, 177).

Giddings indicated that "cops" eventually intervened and took him and Hopson "to the floor."  See (id. at 175, 176).  Giddings was unsure whether the "cops" gave verbal commands to him and Hopson to stop fighting; instead, he recalls them just jumping on his back.[7]  See (id. at 177).  Although Giddings believed that the altercation stopped once the "cops" got him and Hopson to the ground, he did not disagree that video of the incident showed that he was still trying to go after Hopson while CO George was attempting to restrain him.  See (id. at 177, 178).  He also could not disagree that he continued to hold onto Hopson's hair while the correctional officers were trying to separate them.  (Id. at 177.)

---

[6]  Even though Giddings did not comply with Local Rule 56.1 by filing a response to Rogers's statement of undisputed material facts, the Court has considered his sworn deposition testimony when analyzing whether a genuine issue of material fact exists for purposes of resolving the instant motion for summary judgment.

[7]  Giddings explained that he disagreed with correctional officers stating that they gave him and Hopson verbal commands to stop fighting, not because he specifically recalled them not giving verbal commands, but because he believed that correctional officers "lie a lot."  See (id. at 177, 178).

Regarding his interactions with CO George while on the dayroom floor, Giddings acknowledged that he resisted CO George's attempts to restrain him, but he could not recall whether CO George had to take him to the floor twice.  (Id. at 178.)  Nevertheless, while Giddings was on the floor, he recalled Rogers arriving at the dayroom on G-Block.[8]  (Id. at 179, 180.)  CO George and Rogers then handcuffed him, lifted him off the floor, and took him away to the elevator.[9]  (Id. at 175, 179.)  Giddings did not recall Rogers, or any other correctional officer say anything to him during this process.  (Id. at 180.)

Nevertheless, while he was being moved, Giddings claimed that Rogers was "overly aggressive" when pushing him toward the elevator and that Rogers and the other correctional officers moving him "bopped [him] around like a rag doll."  See (id. at 175–76, 181).  Once in the elevator, Rogers told Giddings to "turn and face the fu**ing wall."[10]  See (id. at 176, 181).  Giddings explained that he "guess[ed he] wasn't facing the wall correctly . . . and [Rogers then] elbowed [him]" in the head.  See (id. at 176, 181, 185).  Giddings claimed that the force of Rogers's blow to the back of his head caused the front of his head to hit the elevator wall.  (Id. at 182.)  Giddings denied that he said anything to Rogers or CO George, and he did not believe he turned his head, tensed up his muscles, or did anything to warrant Rogers elbowing the back of his head.  See (id. at 181, 182).  Then, CO George and Rogers "drug [him] out of the elevator,

_____

[8] Giddings agreed that for other correctional officers to show up on G-Block, a back-up call had to have been made.  (Id. at 179–80.)  He did not remember hearing such a call.  (Id.)

[9] Giddings did not recall Rogers giving any verbal commands to him, Hopson, or the other inmates.  (Id. at 179.)  He only remembered Rogers giving verbal commands to the other correctional officers.  (Id.)

[10]  Giddings admitted that he wrote in his complaint that Rogers had told him to face the wall "again."  See (id. at 183).  Upon seeing his complaint, he also admitted that Rogers could have used the word "again" when directing him to face the wall.  (Id.)

took [him] into [the] intake area[,] and then threw [him] in [a holding cell]." See (id. at 176, 182).  Giddings did not recall talking to CO George or Rogers while he was in the holding cell. (Id. at 182.)  He also denied refusing to see the nurse.  (Id. at 182–83.)

Giddings acknowledged that he was written up for the fight with Hopson, but he did not remember the formal charges in the write up.  (Id. at 183.)  Giddings refused to participate in his prison disciplinary hearing relating to the write up.  (Id.)  He was found guilty of misconduct and received thirty (30) days in the "DLU" for it.  See (id.).  Giddings did not appeal from the misconduct finding.  (Id.)

Concerning any injuries he suffered because of Rogers's conduct, Giddings testified that he experienced pain in his lower back, in his neck, and down the right side of his spine.  (Id. at 184.)  He explained that the pain always starts in his neck, and then moves down his body to his mid-back.  (Id.)  He also gets muscle spasms in his back.  (Id.)  When he experiences instances of pain in his back, Giddings writes to medical about it.  (Id.)  He started writing medical about his pain when he was in the SMU.  (Id. at 185.)  In particular, he submitted a medical request slip, after which he was examined by a nurse and prescribed "pain pills."  See (id.)

Two (2) days after seeing the nurse, the LCP doctor visited Giddings.  (Id.)  Despite there being a slip in his medical records indicating that Giddings refused to see the doctor, Giddings denied refusing to see him.  (Id.)  Giddings claimed that the nurse who indicated on the slip that he refused to see the doctor had lied.  (Id. at 185, 186.)

Twelve (12) days after he submitted his first medical request slip, Giddings submitted another request slip to medical.  (Id. at 186.)  At this time, he was still suffering from pain in the same areas of his body, and he claimed that the pills prescribed to him were not working.  (Id.)

On November 26, 2021, he saw Dr. McGlaughlin.[11] (Id.)  Giddings recalled the doctor rubbing a "metal pin or something down [his] back and [his] arms and like [his] reflex spots." See (id.).  The doctor also examined Giddings's hands.  See (id.).  Based on this examination, Dr. McGlaughlin ordered Naproxen for Giddings.  (Id. at 186–87.)

On January 2, 2022, Giddings submitted another medical request slip.  (Id. at 187.)  He asserted that the pain medicine was hurting his stomach, and he was examined by Nurse Sheila. (Id.)  This was the first time he told the medical department that the medication was hurting his stomach.  (Id.)  Nurse Sheila responded to the request slip by indicating that Giddings had not taken the medication for two (2) weeks.  (Id.)  Nevertheless, because of Giddings's complaint, his medication was changed from Naproxen to Tylenol.  (Id.)  Giddings took the Tylenol as instructed.  (Id.)

Later in January 2022, Dr. McGlaughlin examined Giddings.  (Id. at 187–88.)  During this visit, Dr. McGlaughlin noted that Giddings complained about his lower back being tender. (Id. at 188.)  Based on Dr. McGlaughlin's examination and Giddings's complaints, Dr. McGlaughlin ordered Giddings to be x-rayed.  (Id. at 187–88.)  Giddings was x-rayed, although he claims that the process by which he was x-rayed was "[v]ery improper" because "they just . . . threw [him] on the floor and took . . . their [x]-ray." See (id. at 188).

Giddings did not recall seeing Dr. McGlaughlin again on January 30, 2022, even though Giddings's medical records showed that this was when the doctor told him that his x-rays were normal.  (Id. at 188–89.)  At some point, Giddings requested to see a neurosurgeon.  (Id. at 189.)

---

[11]  Dr. McGlaughlin was the LCP medical director.  (Doc. No. 33 ¶ 100.)

Then, two (2) weeks after (possibly) his last visit with Dr. McGlaughlin, Giddings's Tylenol was discontinued because he had not taken it since January 16, 2022.[12]  (Id.)

Giddings' next medical request slip was submitted in August 2022.  (Id.)  At that time, the pain in his back "still c[ame] on [him]."  See (id.).  Although he was still experiencing pain, Giddings was not "writ[ing] it down when it come [sic]."  See (id.).

The day after he submitted the slip, Giddings was taken to medical.  (Id.)  Giddings denied a report in his medical records showing that he refused to be examined.  (Id.)  Then, later that month, Dr. McGlaughlin examined Giddings because of an issue with his right index finger being swollen.  (Id.)  Giddings acknowledged not mentioning anything about his back during this visit, although he claimed that it was because he was only there for the issue with his finger.  (Id. at 189–90.)

In the year prior to his deposition,[13] Giddings did not see Dr. McGlaughlin about any issues with his neck or back.  (Id. at 190.)  Giddings claimed to have submitted request slips through his tablet to be seen by medical, but no one ever came to see him.  (Id.)  Giddings admitted that his use of a tablet was a more recent option because tablets were unavailable for use back in August 2022.  (Id.)

### 3.    Giddings's Medical Records at LCP

The LCP keeps inmate request slips to its medical department in the requesting inmate's medical file.  (Doc. No. 33 ¶ 94.)  According to Giddings's medical file, he did not submit any request slips to the medical department on November 8, 2021, the date of the events at issue in

---

[12]  Giddings testified that he stopped taking Tylenol because the nurses handing it to him were not using gloves.  (Id.)

[13]  Giddings was deposed on September 5, 2023.  (Doc. No. 34 at 172.)

this action.  (Id. ¶ 95.)  In addition, neither a doctor nor a nurse visited Giddings on November 8, 2021.  (Id. ¶ 96.)

Giddings first submitted a request slip regarding complaints of neck and back pain on November 9, 2021.  (Id. ¶ 97.)  On November 10, 2021, LCP Nurse Murphy saw Giddings about his complaints of back and neck pain.  (Id. ¶ 98.)  Nurse Murphy's progress notes from that visit indicate: "Inmate complaint of neck/back pain status-post altercation on 11/8.  Motrin started [sic] added to doctor list for further evaluation and treatment."[14]  See (id. ¶ 99 (quoting Ex. D ¶ 11)); see also (id. ¶ 101).

On November 12, 2021, Giddings refused to see Dr. McGlaughlin regarding his complaints of neck and back pain.  (Id. ¶ 102.)  Then, on November 16, 2021, Giddings received his final dose of Motrin as prescribed by Dr. McGlaughlin's verbal order on November 10, 2021. (Id. ¶ 103.)

On November 21, 2021, five (5) days after receiving his final dose of Motrin, Giddings submitted a request slip regarding complaints of neck and back pain.  (Id. ¶ 104.)  Nurse Sheila responded to this request by noting to Giddings that he had been called to medical on November 12, 2021, but refused to be seen.  (Id. ¶ 105.)  She also asked him whether he was still taking Motrin from the Commissary.  (Id.)

The following day, Giddings submitted another request slip to medical concerning complaints of neck and back pain.  (Id. ¶ 106.)  Nurse Sheila responded to this request by placing Giddings on the list for a medical assessment.  (Id. ¶ 107.)

---

[14] Dr. McGlaughlin had given Nurse Murphy a verbal order to prescribe Giddings Motrin 400mg three (3) times per day.  (Id. ¶ 100.)

On November 26, 2021, Dr. McGlaughlin examined Giddings regarding his complaints of back and neck pain.  (Id. ¶ 108.)  Dr. McGlaughlin's progress notes from this visit (as interpreted by LCP Nurse Supervisor Poorman ("Poorman"))[15] indicate that, inter alia, Giddings (1) had been experiencing back and neck pain for two (2) weeks following being elbowed in the head by "lieutenant" on November 8, 2021; (2) stated that the Ibuprofen he had purchased from the Commissary was not working; (3) was not in acute distress; (4) had full range of motion, including in his neck; (5) had no palpable lumps; and (6) had a "[n]ormal exam."  See (id. ¶ 109). Dr. McGlaughlin prescribed Giddings Naproxen 375mg two (2) times a day for seven (7) days. (Id. ¶ 110.)  Between November 26, 2021, and December 2, 2021, Giddings refused five (5) out of fourteen (14) doses of Naproxen that were provided to him by LCP nurses.  (Id. ¶ 111.)

Giddings submitted a request slip concerning complaints of neck and back pain on December 4, 2021.  (Id. ¶ 113.)  On December 6, 2021, Nurse Murphy saw Giddings about these complaints.  (Id. ¶ 114.)  Nurse Murphy's notes from this visit state: "To sick call complaint of dental pain [sic] #31 is broken.  No symptoms of infection.  Inmate also complained of neck/back pain.  Per inmate, the Naproxen 375mg helped a 'little bit.'  Discussed with doctor." See (id. ¶ 115).  Doctor McGlaughlin gave Nurse Murphy a verbal order to provide Giddings with Naproxen 500mg two (2) times daily as needed.  (Id. ¶ 116.)  Giddings did not take each dose of Naproxen LCP nurses offered to him, and as of December 20, 2021, he refused every dose of Naproxen brought to him on med pass.  (Id. ¶ 117.)

On January 2, 2022, Giddings submitted a request slip in which he complained of neck and back pain, as well as issues with his stomach he was experiencing allegedly due to the pain

---

[15]  Dr. McGlaughlin's notes are very difficult to read.  See, e.g., (Doc. No. 34 at 155).

medication.  (Id. ¶ 118.)  According to Giddings's medical file, this was the first time he alerted

medical staff that his pain medication was hurting his stomach.  (Id. ¶ 119.)

Nurse Sheila responded to Giddings's request slip by noting that he had been

noncompliant with his medication.  (Id. ¶ 120.)  She also questioned whether the medication

could upset his stomach if he was not taking it.  (Id.)  Nevertheless, on January 4, 2022,

Giddings's medical order for Naproxen was discontinued, and Dr. McGlaughlin prescribed

Giddings Tylenol Extra Strength three (3) times per day as needed.  (Id. ¶ 121.)

Starting on January 15, 2022, Giddings refused every dose of Tylenol brought to him on

med pass.  (Id. ¶ 123.)  On the same date, Dr. McGlaughlin saw Giddings about his complaints of

neck and back pain.  (Id. ¶ 124.)  Dr. McGlaughlin's progress notes from this visit (as interpreted

by Poorman) state:

> Inmate complains of diffuse back pain x 1 month "since 12/8/21"
> Previously seen by this provider for same but alleged incident with lieutenant was
> on 11/8/21
> States low back is most tender
> Reportedly noncompliant with treatment!
> No acute distress
> Gait normal
> Poor effort provided by inmate when asked to specifically lift arms, move neck he
> states unable
> When distracted he clearly has full range of motion
> No palpable spasm or deformity
> Reflexes normal symmetric
> Alleged ongoing back discomfort, limited range of motion neck, back,
> ---
> Appears to be malingering
> Check xrays [sic] lumbar spine for completeness
> Recheck as needed
> Further pending xrays [sic] [.]

See (id. ¶ 125).

Giddings had x-rays of his lumbar spine on January 17, 2022.  (Id. ¶ 126.)  The

radiologist interpreting the x-rays determined that there were no compression fractures, bone

destruction, scoliosis, spondylotisthesis, or degenerative disk disease. (Id. ¶ 127.) The radiologist's impression was "[r]adiographically unremarkable and grossly intact lumbar spine." See (id. ¶ 128).

On January 20, 2022, Giddings submitted a request slip seeking to be placed on the bottom bunk of his cell due to his neck and back pain. (Id. ¶ 129.) The following day, Poorman responded to Giddings's request by stating that there was no medical indication for him to be on the bottom bunk according to Dr. McGlaughlin as well as Giddings's x-rays, which were negative. (Id. ¶ 130.)

Three (3) days later, Giddings submitted a request slip asking to be examined by neurosurgeon regarding his back and neck pain. (Id. ¶ 131.) Dr. McGlaughlin saw Giddings regarding this request on January 30, 2022. (Id. ¶ 132.) Dr. McGlaughlin's progress notes (as interpreted by Poorman) state:

> Inmate with request for second opinion with neurosurgeon
> Prior exam/imaging not consistent with any significant issues prompting such
> Inmate alleges discomfort yet does NOT take prescribed Tylenol
> Recheck as needed[.]

See (id. ¶ 133). On February 10, 2022, the prescription for Giddings's Tylenol Extra Strength was discontinued because he had not taken any for three (3) weeks. (Id. ¶ 134.)

According to Giddings's medical records, he did not submit another request slip concerning neck and back pain until August 26, 2022. (Id. ¶¶ 135, 136.) The next day, Giddings refused to have the doctor see him about his complaints of neck and back pain. (Id. ¶ 137.)

Three (3) months later, Dr. McGlaughlin saw Giddings regarding his complaints of back and neck pain. (Id. ¶ 138.) Dr. McGlaughlin's progress notes from this visit (as interpreted again by Poorman) indicated as follows:

> Inmate continues to complain of neck, back pain

> Xrays [sic] fine
> Gait and range of motion normal
> Chronic neck/back pain
> Normal imaging
> No impact to gait, range of motion
> NSAIDS[16] as needed as currently written
> No indication for outside visit
> Recheck as needed[.]

See (id. ¶ 139).

Giddings's medical file indicates that he did not submit another request slip about complaints of neck and back pain until June 16, 2023. (Id. ¶¶ 140, 141.) Four (4) days later, LCP Nurse Hoover saw Giddings about his complaints of neck and back pain. (Id. ¶ 142.) Nurse Hoover's progress notes from this visit state:

> Inmate medical complaint of neck pain and lower back pain still from back in October 2022!! Per inmate the pain comes and goes. Positive range of motion neck area per inmate, no lumps or bumps noted. Inmate agreed to trial [sic] some Tylenol. See doctor order page for orders.

See (id. ¶ 143). Giddings was prescribed Tylenol 1000mg three (3) times per day for seven (7) days. (Id. ¶ 144.) According to Giddings's medical file, he did not submit any additional request slips regarding complaints of neck and back pain. (Id. ¶ 145.)

## II.    LEGAL STANDARD

The Court must render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

---

[16] "NSAIDS" refers to Nonsteroidal Anti-Inflammatory Drugs. See Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/11086-non-steroidal-anti-inflammatory-medicines-nsaids (last visited September 5, 2024).

judgment; the requirement is that there be no genuine issue of material fact." Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

     A disputed fact is "material" if proof of its existence or nonexistence would affect the

outcome of the case under applicable substantive law.  See id. at 248; Gray v. York Newspapers,

Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  A dispute of material fact is "genuine" if "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  See Anderson,

477 U.S. at 257.  When determining whether there is a genuine dispute of material fact, the Court

must view the facts and all reasonable inferences in favor of the nonmoving party.  See id. at 255

("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

in [their] favor.").

     To avoid summary judgment, the nonmoving party may not rest on the unsubstantiated

allegations of their pleadings.  When the party seeking summary judgment satisfies their burden

to demonstrate the absence of a genuine dispute of material fact, the burden of production shifts

to the nonmoving party, who must "go beyond the pleadings" with affidavits, "depositions,

answers to interrogatories, and the like" to show specific material facts giving rise to a genuine

dispute.  See Celotex Corp., 477 U.S. at 324; id. at 328 (White, J., concurring).  The nonmoving

party "must do more than simply show that there is some metaphysical doubt as to the material

facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)

(citation omitted).  Instead, they must produce evidence to show the existence of every element

essential to their case that they bear the burden of proving at trial, for "a complete failure of

proof concerning an essential element of the nonmoving party's case necessarily renders all other

facts immaterial."  See Celotex Corp., 477 U.S. at 323; see also Harter v. GAF Corp., 967 F.2d

846, 852 (3d Cir. 1992) (explaining that since plaintiff had the burden of proof, "[they] must

make a showing sufficient to establish the existence of every element essential to [their] case"
(citations omitted)).

As noted <u>supra</u>, when determining whether a dispute of material fact exists, the Court
must consider the evidence in the light most favorable to the non-moving party.  <u>See</u> <u>Matsushita</u>
<u>Elec. Indus. Co.</u>, 475 U.S. at 588 (citation omitted).  In doing so, the Court must "accept the non-
movant's allegations as true and resolve any conflicts in [their] favor."  <u>See</u> <u>White v.</u>
<u>Westinghouse Elec. Co.</u>, 862 F.2d 56, 59 (3d Cir. 1988), <u>abrogated on other grounds by</u> <u>Hazen</u>
<u>Paper Co. v. Biggins</u>, 507 U.S. 604 (1993).  However, a party opposing a summary judgment
motion must comply with Local Rule 56.1, which specifically directs the oppositional party to
submit a "statement of the material facts, responding to the numbered paragraphs set forth in the
statement required [to be filed by the movant], as to which it is contended that there exists a
genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the
statement required to be served by the moving party will be deemed to be admitted."  <u>See</u> L.R.
56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact
that they are a pro se litigant because these rules apply with equal force to all parties.  <u>See</u> <u>Mala</u>
<u>v. Crown Bay Marina, Inc.</u>, 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot
flout procedural rules—they must abide by the same rules that apply to all other litigants").

Even if the Court deems the facts in the moving party's submission to be admitted due to
the nonmoving party's failure to comply with Local Rule 56.1, the Court cannot simply grant the
motion for summary judgment as unopposed.  Instead, the Court can only grant the motion if the
Court "find[s] that judgment for the moving party is 'appropriate.'"  <u>See</u> <u>Anchorage Assocs. v.</u>
<u>V.I. Bd. of Tax Rev.</u>, 922 F.2d 168, 175 (3d Cir. 1990).  The analysis for determining whether

judgment is "appropriate" depends on whether the party moving for summary judgment bears the "burden of proof on the relevant issues":

> Where the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law. Where the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.

See id. (citing Celotex Corp., 477 U.S. 317).

## III.    DISCUSSION

Giddings's claim against Rogers is a Section 1983 claim for excessive force. Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. See 42 U.S.C. § 1983. This statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id. "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002)). A Section 1983 plaintiff must show a "violation of a right secured by the Constitution and laws of the United States, and . . . that the alleged deprivation was committed by a person acting under color of state law." See West v. Atkins, 487 U.S. 42, 48 (1988).

In this case, because Giddings was a pretrial detainee when the alleged incident with Rogers occurred, the Due Process Clause of the Fourteenth Amendment, rather than the Cruel

and Unusual Punishment Clause of the Eighth Amendment, governs his excessive force claim

against Rogers.  See Wharton v. Danberg, 854 F.3d 234, 247 (3d Cir. 2017) (citing Bell v.

Wolfish, 441 U.S. 520, 535 n.16 (1979)).  Pretrial detainees are entitled to at least as much

protection from excessive force as prisoners who have been convicted of a crime.  See Bistrian v.

Levi, 912 F.3d 79, 91 (3d Cir. 2018) (citing Kost v. Kozakiewicz, 1 F.3d 176, 188 n.10 (3d Cir.

1993)).  However, unlike prisoners who have been convicted of a crime, who may not be

subjected to cruel and unusual punishment, pretrial detainees "cannot be punished at all under

the Due Process Clause."  See Hubbard v. Taylor, 399 F.3d 150, 166 (3d Cir. 2005) (citing Bell,

441 U.S. at 535).  Thus, pretrial detainees may not be subjected to "excessive force that amounts

to punishment."  See Jacobs v. Cumberland County, 8 F.4th 187, 194 (3d Cir. 2021) (quoting

Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)).

Unlike excessive force claims under the Eighth Amendment, which require plaintiffs to

establish both an objective element and a subjective element to prove excessive force, excessive

force claims under the Fourteenth Amendment are based exclusively on an objective-

reasonableness standard.  See id. (citing Kingsley v. Hendrickson, 576 U.S. 389, 396–400

(2015)).  Therefore, a pretrial detainee seeking to establish that the use of force was excessive

"must show only that the force purposely or knowingly used against him was objectively

unreasonable."  See id. (citing Kingsley, 576 U.S. at 396–97).  A plaintiff can establish that the

force used was excessive if they show that the force was "not 'rationally related to a legitimate

nonpunitive governmental purpose'" or that the force used was "excessive in relation to that

purpose."  See id. (quoting Bell, 441 U.S. at 561).

There is no mechanical formula for determining when force is objectively unreasonable

under the Fourteenth Amendment.  See Kingsley, 576 U.S. at 397 (citing County of Sacramento

v. Lewis, 523 U.S. 833, 850 (1998)).  Instead, courts and juries must look to the particular facts

and circumstances of the case, including, but not limited to:

> the relationship between the need for the use of force and the amount of force used;
> the extent of the plaintiff's injury; any effort made by the officer to temper or to
> limit the amount of force; the severity of the security problem at issue; the threat
> reasonably perceived by the officer; and whether the plaintiff was actively resisting.

See id. (citing Graham, 490 U.S. at 396).[17]  These facts and circumstances should be considered

"from the perspective of a reasonable officer on the scene, including what the officer knew at the

time, not with the 20/20 vision of hindsight."  See id.  This consideration "adequately protects an

officer who acts in good faith," insofar as it recognizes that "[r]unning a prison is an inordinately

difficult undertaking, . . . and that safety and order at these institutions requires the expertise of

correctional officials, who must have substantial discretion to devise reasonable solutions to the

problems they face."  See id. at 399 (internal quotation marks and citations omitted).  In addition,

"a court must take account of the legitimate interests in managing a jail, acknowledging as part

of the objective reasonableness analysis that deference to policies and practices needed to

maintain order and institutional security is appropriate."  See id. at 399–400.

Applying this standard for Fourteenth Amendment excessive force claims to the

undisputed facts of this case, including the video of the incident, the Court will grant Rogers's

motion for summary judgment because he is entitled to judgment as a matter of law.  More

specifically, there is insufficient evidence in the record for a reasonable factfinder to conclude

that Rogers's use of force was objectively unreasonable.

---

[17]  The Supreme Court explained that it did "not consider this list to be exclusive."  See id.
Instead, the Court "mention[ed] these factors only to illustrate the types of objective
circumstances potentially relevant to a determination of excessive force."  See id.

In the first instance, Rogers's use of force by pushing his forearm into the back of Giddings's head was an act to achieve the legitimate nonpunitive government purpose of getting Giddings to comply with his and CO George's verbal instructions to him to face the corner of the elevator.  In addition, the force Rogers used was not excessive in relation to that purpose.  See, e.g., McGovern v. Lucas County, Ohio, No. 18-cv-02506, 2021 WL 1176737, at *9 (N.D. Ohio Mar. 29, 2021) ("The video demonstrates [the defendant correctional officer's] actions were rationally related to a legitimate nonpunitive government purpose (gaining control over a jail detainee who was involved in an altercation with another corrections officer) and that [the defendant correctional officer's] use of force was not excessive in relations to that purpose.").

As for whether the force Rogers used was excessive, the Court starts with the first Kingsley factor, namely, whether there was a relationship between the need to use force and the amount of force used.  See 576 U.S. at 397.  Here, there is no genuine dispute that there was a reasonable relationship between the need to use at least some force and the amount of force Rogers used to get Giddings to comply with the verbal commands to face the corner of the elevator.

Prior to Rogers arriving in G-Block in response to an "officer needs assistance" call, which signified to Rogers that at least one (1) inmate was combative and correctional officers were physically involved with at least one (1) inmate, Giddings repeatedly failed to comply with verbal commands to stop fighting.  He also repeatedly resisted CO George's attempts to restrain him, to the point where CO George had to take him to the floor twice.  Once the correctional

officers were able to finally handcuff Giddings, the video footage from LCP shows that one (1) minute elapsed between securing Giddings and getting him into the elevator.[18]

While inside the elevator, Giddings did not comply with verbal commands to face the corner of the elevator.  Although Giddings testified in his deposition that Rogers did not issue a verbal command to face the corner, his complaint suggests otherwise.  In particular, Giddings essentially admitted that he had already been told to face the corner before Rogers acted when he alleged in the complaint that Rogers stated, "I told you to face the fu\*\*ing wall again."  See (Doc. No. 1 at 4 (emphasis added)).  When confronted with his allegations during his deposition, Giddings admitted that it was possible that Rogers had already directed him to face the corner prior to using force.  In addition, despite both CO George and Rogers having their hands on Giddings to maintain control over him, Giddings physically resisted their efforts to keep him facing the corner as shown in the surveillance video when he pushed back and turned his head towards them.  At this point, some force was necessary to gain Giddings's compliance in the elevator.

The amount of force Rogers used, as shown in the surveillance video, was quickly moving his left forearm from Giddings's left shoulder to the back of Giddings's head, which redirected Giddings toward the corner of the elevator.  Contrary to Giddings's allegation in the complaint, this was not an elbow to the back of his head, which sounds like Rogers struck him in

---

[18]  Regarding the surveillance footage Rogers submitted with his motion, the Court notes that "the Supreme Court has instructed courts to consider video evidence in the record and to 'view[] the facts in the light depicted by the videotape,' especially when it 'blatantly contradict[s]' the nonmovant's narrative."  See Bland v. City of Newark, 900 F.3d 77, 87 n.7 (3d Cir. 2018) (quoting Scott v. Harris, 550 U.S. 372, 380–81 (2007)); Dimoff v. Amarose, No. 22-cv-00072, 2024 WL 3330566, at \*5 (M.D. Pa. July 8, 2024) ("When there is videotaped evidence in the record, the court is obliged to consider it when determining whether there is a genuine dispute of material fact, and the Court must view the facts in the light depicted by the videotape." (citing Scott, 550 U.S. at 380–81; El v. City of Philadelphia, 975 F.3d 327, 333 (3d Cir. 2022))).

the back of a head just as someone would if they had punched him.  Instead of striking Giddings in the back of the head, the surveillance video shows that Rogers quickly moved his left forearm from Giddings's left shoulder to push the back of his head.  Rogers then kept his forearm on the back of Giddings's head to keep him in place, i.e., facing the corner of the elevator, until the elevator door opened.  Once the elevator door opened, Rogers deescalated the force he was using to control Giddings.  Under the circumstances, the force Rogers used was minimal to compel Giddings to comply with his and CO George's verbal commands to face the corner of the elevator.  As Rogers indicated in his declaration attached as an exhibit to his motion, based on his training and experience, he used minimal pressure on the back of Giddings's head to assert control over an individual who had been combative, who had been a security threat to both correctional officers and other inmates, and who had consistently noncompliant with verbal and physical directives.

Regarding the second Kingsley factor—the extent of Giddings's injuries—the Court recognizes that "[t]he lack of any significant injury weighs against [a plaintiff's excessive force] claim, but it is not dispositive."  See Aruanno v. Maurice, 790 F. App'x 431, 434 (3d Cir. 2019) (unpublished); see also Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) (explaining, in the context of an Eighth Amendment excessive force claim, that even though an "inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim, . . . [a]n inmate who is gratuitously beaten by guards does not lose [their] ability to pursue an excessive force claim merely because [they] ha[ve] the good fortune to escape without serious injury"); Robinson v. Danberg, 673 F. App'x 205, 209–10 (3d Cir. 2016) (unpublished) (reversing district court's grant of summary judgment in favor of a correctional official in Fourteenth Amendment excessive force claim because the district court "focused exclusively on

25

the severity of [plaintiff's] injury at the expense of the other Kingsley factors").  Nevertheless, the record evidence shows that any injury was minor, which weighs against Giddings's excessive force claim.[19]

In this regard, while Giddings periodically complained about pain to his neck and back, the x-ray of Giddings's back was normal and did not reveal any injuries.  Additionally, Dr. McGlaughlin examined Giddings on multiple occasions, did not discover any physical injuries during these examinations, and surmised that Giddings was malingering and restricting his effort while being examined.  Moreover, while Giddings was prescribed Naproxen and Tylenol Extra Strength for his pain, he did not take these pain medications as directed, which ultimately led to both prescriptions being discontinued.  Furthermore, Giddings's written requests for medical attention due to his back and neck pain were infrequent and became even more infrequent as time moved along.  On the whole, although the Court is not discounting any back or neck pain that Giddings may have experienced, the record evidence does not show that Giddings's injuries were anything more than minor.

As for the third Kingsley factor—any effort by Rogers to temper or limit the amount of force used—the surveillance footage shows that Rogers limited his use of force to that needed to keep control of Giddings in the elevator.  Prior to using the force at issue in this case, Rogers and CO George attempted to temper the severity of any response by giving verbal commands that

---

[19]  While this is unrelated to analyzing the extent of Giddings's alleged injuries, the Court notes that Giddings never identified any competent evidence showing that Rogers use of force to the back of his head caused the pain in his neck and back.  Prior to Rogers's use of force, Giddings was in a fight with Hopson that, according to Giddings, could have lasted (but did not) ten (10) to twenty (20) minutes.  Giddings also acknowledged during his deposition that Hopson struck him in the face, which could have impacted his neck.  Giddings was then physically resisting CO George's attempts to restrain him to the point that he had to be taken to the floor twice.  Overall, there is no evidence in the record, other than Giddings's unsupported speculation, that Rogers's conduct caused any issues with his neck or back.

Giddings face the corner of the elevator, which he ignored.  See, e.g., Fairchild v. Coryell County, Texas, 40 F.4th 359, 364–65 (5th Cir. 2022) (finding that "jailers did arguably temper or attempt to limit their force by first using verbal commands"); Robison v. Testa, 20-cv-00263, 2021 WL 5770211, at *5 (W.D. Pa. Dec. 6, 2021) (determining that correctional officer attempted to limit the amount of force used by issuing verbal commands and directions); Lambert v. Thomas, No. 20-cv-00002, 2021 WL 1156857, at *6 (W.D. Va. Mar. 26, 2022) ("[T]he prior use of verbal orders indicates [that the officers made] efforts to temper [their] use of force throughout the incident.").  Only after Giddings refused to obey the correctional officers' orders and began to actively resist did Rogers use his left forearm to direct Giddings's head toward the corner of the elevator, and he held it there (thus keeping Giddings head pointing toward the corner) only so long as needed to complete the trip on the elevator.  Thus, this factor weighs in favor of Rogers.

Concerning the fourth and fifth Kingsley factors—the severity of the security problem at issue and the threat reasonably perceived by Rogers—no reasonable factfinder could conclude on the record presented that Giddings's fight with Hopson was not a serious incident that threatened jail security as well as the safety of inmates and jail officials.  "Violent and disruptive situations within a jail or correctional setting . . . present obvious threats to jail security."  Segura v. Cherno, No. 21-cv-00740, 2022 WL 3587860, at *6 (D. Or. May 25, 2022) (citing cases), report and recommendation adopted, 2022 WL 3586721 (D. Or. Aug. 22, 2022).  Here, Giddings and Hopson engaged in fight during which they ignored correctional officers' verbal commands to stop fighting.  When correctional officers attempted to pull Giddings and Hopson apart, Giddings continued to hold onto Hopson's hair.  Even when CO George finally got Giddings away from

Hopson and took him to the floor, Giddings continued to resist and attempt to move toward

Hopson, which resulted in CO George having to take Giddings to the floor again.

At the time Rogers arrived at G-Block, he saw both CO Grimm and CO George

struggling to control Hopson and Giddings, respectively.  He had to intervene in both situations

to ensure that Hopson and Giddings were secured, handcuffed, and taken away to holding cells.

Only approximately one (1) minute after Giddings was secured did Rogers use force to get him

to comply with verbal orders to face the corner of the elevator.  Thus, the emergency created by

the fight and the participants' refusal to comply with verbal orders did not cease simply because

Giddings was now in handcuffs and in the elevator.  Just as he had on the G-Block dayroom

floor, Giddings continued to disregard verbal orders and was physically resisting the correctional

officers' commands despite being handcuffed.  It was therefore reasonable for Rogers to perceive

Giddings as a threat to him and CO George.  See Knight v. Walton, No. 12-cv-00984, 2015 WL

9243902, at *4–5, 16–17 (W.D. Pa. Sept. 24, 2015) (concluding that a correctional officer

reasonably perceived handcuffed inmate's "sudden turning movement" away from the

correctional officer as a real threat), report and recommendation adopted, 2015 WL 9239003

(W.D. Pa. Dec. 17, 2015), aff'd, 660 F. App'x 110 (3d Cir. 2016) (unpublished); see also Amaro

v. Kirk, 252 F. Supp. 3d 397, 403 (D. Del. 2017) (concluding that "[g]iven the previous

[altercation between plaintiff and his] cellmate and the apparent effort by correctional officers to

maintain order in the housing unit, it was not unreasonable for [the correctional officer] to

perceive that plaintiff's actions posed a security risk or to take measures to ensure compliance

with his direct orders and quell the perceived risk").

The sixth, and final, Kingsley factor—whether the plaintiff was actively resisting—also

weighs in favor of Rogers.  As already stated, Giddings actively resisted by repeatedly ignoring

verbal commands both in the dayroom and in the elevator.  Also, the surveillance video shows that while he was in the elevator, Giddings physically resisted Rogers's attempt to direct him to look at the corner and then turning his head towards Rogers.

In total, the uncontradicted evidence in the record shows that no reasonable factfinder could conclude that Rogers's use of force was objectively unreasonable.  The evidence neither demonstrates that the force Rogers used was "not 'rationally related to a legitimate nonpunitive governmental purpose'" or that the force he used was "excessive in relation to that purpose." See Jacobs, 8 F.4th at 194 (quoting Bell, 441 U.S. at 561).  Accordingly, summary judgment in Rogers's favor on Giddings's Section 1983 Fourteenth Amendment excessive force claim is warranted.

## IV.   CONCLUSION

For the aforementioned reasons, the Court will grant Rogers's motion for summary judgment and enter judgment in his favor and against Giddings on Giddings's Section 1983 claim for excessive force in violation of the Fourteenth Amendment.  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania